UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
DANIEL T. RUSSO, on behalf of himself and all         :
others similarly situated,
                                                      :
                                                      :
                        Plaintiff,                    :
                                                      :    08 Civ. 10631 (SHS)
            -against-                                 :
                                                      :    OPINION & ORDER
TODD BRUCE, GORDON M. THOMPSON,                       :
MARC J. OPPENHEIMER, ROBERT A. FUNG,                  :
and CRYSTALLEX INTERNATIONAL                          :
CORPORATION,                                          :
                                                      :
                        Defendants.                   :
                                                      :
----------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

       This securities fraud action against Crystallex International Corporation and certain of its

officers and directors arises from the company's failure to obtain an environmental permit

necessary to mine for gold in Venezuela.  Plaintiffs and a putative class of Crystallex

shareholders seek to recover losses resulting from defendants' allegedly fraudulent

misrepresentations about the likelihood Crystallex would obtain the permit from the Venezuelan

authorities.  Plaintiffs assert claims pursuant to Sections 10(b), 20(a) and 20A of the Securities

Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), 78t-1(a), and Securities and Exchange

Commission Rule 10b-5 promulgated pursuant to that statute, 17 C.F.R. § 240.10b-5.

       Defendants have moved to dismiss the amended complaint for failure to state a claim

pursuant to Federal Rule of Civil Procedure 12(b)(6).  Because the amended complaint fails to

plead facts sufficient to raise a strong inference of scienter on the part of defendants, that motion

is granted and the complaint is dismissed.

## I.  BACKGROUND

The following facts are taken from plaintiffs' Amended Class Action Complaint ("Complaint") and are assumed to be true for purposes of this motion.

### A.  The Parties

On April 7, 2009, this Court appointed Andrew J. Colace, Thomas E. Montesion, Frederic Bouin, John D. Stone and Daniel DeNeve to act as lead plaintiffs in this securities class action.  Those individuals purchased Crystallex common stock between March 27, 2006 and April 30, 2008 (the "Class Period").  (Am. Class Action Compl. ("Compl.") ¶¶ 20, 28.)  They seek to represent a class of all those who bought Crystallex stock during the Class Period.  (*Id.* ¶ 28.)  Daniel T. Russo, another purchaser of Crystallex shares during the Class Period, is also a named plaintiff.  (*Id.* ¶ 20.)

Defendant Crystallex International Corporation is a gold mining company headquartered in Toronto, Canada.  (*Id.* ¶ 21.)  Its shares trade on the American Stock Exchange.  (*Id.* ¶ 18.)

Todd Bruce, Gordon M. Thompson, Robert A. Fung and Marc J. Oppenheimer constitute the "Individual Defendants" and each was the Chief Executive Officer ("CEO") of Crystallex at various times.  Bruce was Crystallex's CEO from 2003 until early 2007.  (*Id.* ¶ 22.)  Thompson replaced Bruce as CEO and held that office until June 3, 2008.  (*Id.* ¶ 23.)  Thompson remains a director of the company.  (*Id.*)  Fung has been Crystallex's chairman since 1998 and took over from Thompson as CEO in 2008.  (*Id.* ¶ 25.)  Oppenheimer has been a Crystallex director since 1995 and served as CEO between 1995 and 2003.  (*Id.* ¶ 24.)

### B.  Crystallex and the Las Cristinas Permit Application

Located in the Venezuelan state of Bolivar, the Las Cristinas gold deposit potentially contained more than 20.8 million ounces of gold.  (*Id.* ¶¶ 5, 35.)  In September 2002, Crystallex

2

entered into a "Mining Operation Agreement" with Venezuela's state-owned mining enterprise, the Corporacion Venezolana de Guayana ("CVG"), that granted the company the right to conduct mining operations at Las Cristinas.  (*Id.* ¶¶ 3-4.)  The contract granted Crystallex no ownership or other rights to the deposit.  (*Id.* ¶ 4.)  Crystallex's interest in developing Las Cristinas was its principal asset.  (*Id.* ¶ 21.)

Pursuant to the Mining Operation Agreement, Crystallex's right to mine was contingent on obtaining the necessary permits from the Venezuelan government and funding social welfare projects in the Las Cristinas region.  (*Id.* ¶ 37.)  Chief among the necessary permits was an environmental one, the "Authorization to Affect Natural Resources," a.k.a. the "Final Permit." (*Id.*)  The Vice Minister for the Ministry of the Environment and Natural Resources ("MARN")[1] was responsible for issuing the Final Permit.  (*Id.* ¶ 4.)

C.  The Alleged Fraud

Plaintiffs allege that throughout the Class Period defendants issued false and misleading statements regarding the status of Crystallex's application for the Final Permit, all the while knowing or recklessly disregarding Crystallex's dwindling or nonexistent prospects for success. Defendants' purported fraud allegedly caused plaintiffs to purchase Crystallex stock at artificially inflated prices.  When MARN ultimately denied Crystallex's request for the Final Permit in April 2008, Crystallex's common stock lost 45% of its value.  (*Id.* ¶ 150.)

1.  *Crystallex indicates the permit application is complete*

In March 2006, Venezuela's mining ministry approved the technical, economic and financial "Feasibility Study" for the Las Cristinas project.  (*Id.* ¶ 65.)  Bruce, then CEO, touted this development in a March 26, 2006 press release, explaining that the mining ministry's

---

[1]     MARN was also known as "MinAmb."  (Compl. ¶ 4.)  For simplicity's sake, the Court refers to the agency consistently as MARN.

approval "represents the crucial cornerstone for the development of the Las Cristinas gold project and also represents the final external input required by the Ministry of the Environment and Natural Resources ("MARN") to complete the permitting process.  We anticipate receiving this MARN permit in the near term . . . ."  (*Id.*)  On March 31 and May 11, 2006, defendants repeated the statement that mining ministry's approval was the "last external input" MARN required to complete its administrative process.  (*Id.* ¶¶ 68, 71.)  According to plaintiffs, these statements were false and misleading because MARN "would require many other 'external inputs' from Crystallex before the Final Permit might be issued, thus increasing the risk that the Final Permit would be delayed or denied."  (*Id.* ¶ 67.)

### 2.   *Crystallex reacts to potential changes in Venezuela mining laws*

Later in 2006, various news outlets reported on potential nationalization of mining in Venezuela whereby the government would own a majority-stake in "mixed" joint ventures with private firms.  (*Id.* ¶ 73.)  In response to these reports, Bruce told investors in a June 13, 2006 press release that Crystallex had "a valid and binding contract to operate the Las Cristinas project, which is 100% owned by the Nation of Venezuela."  (*Id.* ¶ 75.)  A news article nine days later quoted Bruce as deploring the "sensationalist headlines" about Venezuela's policy changes.  (*Id.* ¶ 77.)  In Bruce's view, Venezuela was moving away from granting mining concessions in favor of operating contracts such as the one awarded Crystallex.  (*Id.*)

Plaintiffs fault defendants for not "showing concern for the changing attitude and climate in Venezuela toward mining."  (*Id.* ¶ 78.)  In their view, "the Company's rights, if any, were extremely tenuous and uncertain given the change in the political climate."  (*Id.* ¶ 76.)

### 3.   *Crystallex sees no impediments to issuance of the Final Permit*

Beginning in February 2007, Crystallex and its officials repeatedly stated that they saw

no obstacles to obtaining the Final Permit, which they expected would issue shortly.  For instance, in a February 1, 2007 press release, Fung, the company's chairman, said "Crystallex is not aware of any impediments to granting the permit" and "Crystallex expects they [Venezuelan officials] will proceed quickly with the issuance of the permit."  (*Id.* ¶ 86.)  Thompson, the company's recently-named CEO, was quoted in a March 6, 2007 news article stating that Crystallex was "[c]loser than [it had] ever been before" to getting a permit and that "[t]here's nothing in the way of it happening."  (*Id.* ¶ 88.)  Later in March 2007, Thompson described MARN's approval of another gold mining company's permit application for the Las Brisas mine as "a clear signal that Venezuela is fulfilling its promise to advance mining projects.  Crystallex is in the final stages of environmental permitting for the Las Cristinas projects and looks forward to the timely conclusion of the permitting process at MARN."  (*Id.* ¶ 92.)  In a subsequent article, apparently on the website Vheadline.com, Thompson elaborated on the relationship between the project MARN had approved and Las Cristinas: "One can't go ahead until the other goes ahead, and we're hoping that very soon after Easter we should be in the very same position" as the other project.  (*Id.* ¶ 93.)  Defendants reiterated that Crytallex was in the "final" stages of the permitting process on multiple occasions.  (*Id.* ¶¶ 94, 99.)

Plaintiffs contend that these statements gave the false and misleading impression that "receipt of the Final Permit was at hand" (*id.* ¶ 87), when in reality defendants knew or should have known "that the Venezuelan government had several problems with Crystallex's permit application" (*id.* ¶ 89).  Voicing these apparent concerns was Sergio Rodriguez, the director of planning at MARN, who told the news agency Reuters that Crystallex had "not acted responsibly in drawing up the project so as to minimize environmental objections," specifically faulting Crystallex's plan for failing to take advantage of copper found in the gold deposit and for lacking

a plan to destroy cyanide used in the mining process.  (*Id.* ¶ 96.)  In response to these comments, defendants issued what plaintiffs characterize as a "false exculpatory statement" in which Crystallex stated that senior MARN officials, including Rodriguez, told the company that the Reuters story did "not reflect the statements made by Mr. Rodriguez" and that MARN would contact Reuters for a correction.  (*Id.* ¶ 97.)  MARN did not contact Reuters to correct the story, but Reuters did follow up with Rodriguez, who "stood by his position that Crystallex had to alter the project," but added that "the uproar around his comments was based on a misunderstanding that Crystallex had to draw up a new project."  (*Id.* ¶ 96.)

### 4.  *Crystallex says that all the requirements for the permit have been met*

On June 14, 2007, Crystallex issued a press release that MARN had approved the company's Environmental Impact Study ("EIS") for the Las Cristinas project.  (*Id.* ¶ 101.)  MARN communicated this approval to CVG and explained the need for the posting of a bond and the payment of certain taxes for the issuance of the Final Permit, both of which Crystallex subsequently did.  (*Id.*)  According to the press release, "CVG confirmed that the approval of the EIS, the posting of the bond and the payment of the taxes represent the final and conclusive step in the procedure for the issuance of the Environmental permit."  (*Id.*)  In the release, CEO Thompson said Crystallex had "complied with the very final stage of the procedure for receipt of the environmental permit."  (*Id.*)  Over the next nine months, defendants made statements to similar effect.  (*Id.* ¶¶ 102, 104, 106, 108, 110, 112.)  For example, a company official was quoted in a November 2007 Reuters article saying, "All of the requirements are covered . . . the permit should be assigned to us at any moment."  (*Id.* ¶ 106.)  And Thompson stated in a February 28, 2008 press release that "all the requirements for the issuance of the Las Cristinas Environmental permit had been fulfilled" and "[n]o impediments have been raised in discussions

with Government officials, and they've recently confirmed we're in good standing for the issuance of the permit." (*Id.* ¶ 110.)

These statements were false and misleading, in plaintiffs' view. The Complaint alleges that defendants "should have had serious concerns and questions about the viability of the Las Cristinas project." (*Id.* ¶ 103.) The delay in the receipt of the permit even after Crystallex "had supposedly been told it was in the 'final steps in the process for the issuance of the [Final] Permit'" in June 2007 "was a red flag to Crystallex management that the environmental issues that the MARN [via Sergio Rodriguez] raised in March 2007 had not been resolved." (*Id.*) So too were the comments of Sergio Rodriguez at an October 2007 hearing before a committee of Venezuela's National Assembly. (*Id.* ¶ 105.) Plaintiffs allege that

> [u]nlike the other participants at this hearing, Sergio Rodriguez did not testify that all requirements for the issuance of the Final Permit had been met. On the contrary, the minutes of the hearing state that he "referred, in general, to *environmental aspects*" of the project. The minutes also note under Rodriguez's name that "In a second exchange of ideas, the participants in the meeting agreed to study a proposal based on the endogenous development of the region [endógeno de la región], with an integral view that includes the people's participation, taking the Community Councils as a basis. This proposal should provide for sustainable development and have a marked social participation.

(*Id.* (bracketed material in original).) According to plaintiffs, this demonstrated that "the requirements for receiving the Final Permit were still not met." (*Id.*)

The Complaint also alleges "[t]he fact that the Company might be subject to serious delays in obtaining the Final Permit was well known for many years to Crystallex and its management." (*Id.* ¶ 125.) Plaintiffs base this on the company's affiliation with Enrique Tejera-Paris, a Crystallex board member since 1997 and someone who apparently was involved in a failed 2002 coup against Venezuelan President Hugo Chavez. (*Id.* ¶¶ 126, 127.) A former Crystallex employee told VHeadline.com in December 2008 that "it was already made known to

Crystallex several years ago" that Tejera-Paris's involvement with the company "made it impossible for the CVG/Crystallex deal to go through."  (*Id.*)

     D.  <u>MARN Denies the Final Permit</u>

Crystallex announced on April 30, 2008 that MARN had denied its request for the Final Permit.  (*Id.* ¶ 115.)  The company's press release stated that the denial, which was communicated to CVG, cited "sensitivities surrounding indigenous peoples, the small miners and the environment in the area generally known as the Imataca Forest Reserve," which contains the Las Cristinas deposit.  (*Id.*)  Crystallex noted that the denial "appears to be in conflict with the Las Cristinas EIS approval, Construction Compliance Bond Request and Environmental Tax request issued by [MARN] (that Crystallex posted and satisfied last summer)."  (*Id.*) Crystallex's share price fell from $1.68 to $0.91 on the news.  (*Id.* ¶ 116.)  Previously, the stock had traded above $6 at points during the Class Period.  (*Id.*)  Crystallex later revealed that the permit was denied on April 14, 2008.  (*Id.* ¶ 147.)

     E.  <u>This Action</u>

Plaintiffs allege three causes of action pursuant to three different sections of the Securities Exchange Act of 1934.

Count I charges all defendants with violating Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  (*Id.* ¶¶ 156-60.)  Section 10(b) prohibits the use of "any manipulative or deceptive" practice "in connection with the purchase or sale of any [registered] security."  15 U.S.C. § 78j(b).  Rule 10b-5 specifies that it is "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

Plaintiffs contend that defendants, with knowledge of or reckless disregard for the truth, disseminated or approved during the Class Period the false and misleading statements described above.  (Compl. ¶ 158).

Plaintiff Daniel Russo, who acquired Crystallex shares on April 21 and 24, 2008, alleges in Count II that defendant Oppenheimer violated Section 20A of the Exchange Act.  (*Id.* ¶¶ 161-67.)  Pursuant to Section 20A, any person who violates the Exchange Act or its rules and then trades in the security at issue while in possession of material, nonpublic information is liable to any person who contemporaneously purchased that security.  15 U.S.C. § 78t-1(a).  The Complaint alleges that Oppenheimer sold 313,658 shares of Crystallex stock on April 21, 2008 knowing what the market did not: that Crystallex had been denied the Final Permit.  (Compl. ¶¶ 147, 163.)

All plaintiffs join in Count III, which accuses the Individual Defendants of violating Section 20(a) of the Exchange Act.  (*Id.* ¶¶ 168-70.)  That section creates liability for persons who control others who violate the Exchange Act or its rules.  15 U.S.C. § 78t(a).  Plaintiffs allege that by virtue of their power and authority over Crystallex, the Individual Defendants are liable as control persons for Crystallex's wrongful conduct.  (Compl. ¶ 169.)

## II.  DISCUSSION

### A.  Standard of Review

Defendants move pursuant to Rule 12(b)(6) to dismiss the Complaint in its entirety for the failure to state a claim upon which relief can be granted.  In resolving this motion, a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  In addition to the complaint, a court may also consider "any written instrument attached to the

complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *Id.*

A complaint will survive a Rule 12(b)(6) motion only if it sets forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint satisfies this plausibility standard "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

B. Rule 10(b) and Rule 10b-5 Claims

To state a claim for securities fraud pursuant to Section 10(b) and Rule 10b-5, a complaint must allege that a defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re Int'l Bus. Machs. Corporate Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998).

Two heightened pleading standards apply in securities fraud cases. First, Federal Rule of Civil Procedure 9(b) requires that a complaint alleging fraud "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This means that that the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (internal quotation marks omitted). Second, the Private Securities Litigation Reform Act of 1995 ("PSLRA") "insists that

securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with'" scienter.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)).

Defendants argue that plaintiffs' allegations of falsity and scienter do not satisfy these heightened pleading standards.  They further contend that all of the supposed misstatements are forward-looking statements immune to liability under both the safe harbor provision of the PSLRA, 15 U.S.C. § 78u-5(c), and the bespeaks caution doctrine.  Finally, defendants maintain that the Complaint does not adequately allege that the supposed misstatements caused plaintiffs' supposed losses.

For the reasons set forth below, the Court concludes that plaintiffs have failed to plead scienter adequately for any of the misstatements alleged in the Complaint.  The Court does not address defendants' remaining arguments.

## C.   Plaintiffs Fail to Plead Scienter for Statements Related to the Permit Process

The purported misrepresentations regarding the permitting process take different forms. In the early part of the Class Period defendants told investors that MARN had all the information it needed to complete the permitting process.  (Compl. ¶¶ 65, 68, 71.)  Later came defendants' refrain that the permitting process was in its "final" stages.  (*Id.* ¶¶ 92, 94, 99.)  Defendants also assured investors that they met the requirements for the Final Permit and knew of no impediments to its receipt.  (*Id.* ¶¶ 86, 88, 101, 102, 104, 106, 108, 110, 112.)  And defendants advised investors of their expectation that Venezuela would issue the permit in the near future. (*Id.* ¶¶ 93, 106 .)  All supposedly had the similar effect of misleading investors about Crystallex's likelihood of success in obtaining the Final Permit.  None of these statements may

give rise to liability under Section 10(b) or Rule 10b-5 unless defendants acted with scienter.

Scienter is "'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).  The PSLRA requires that a complaint, to withstand a motion to dismiss, contain particularized facts giving rise to "a strong inference" that the defendant acted with scienter.  15 U.S.C. § 78u-4(b)(2).  To qualify as "strong" an inference "must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations."  *Tellabs*, 551 U.S. at 324.  Accordingly, "the court must take into account plausible opposing inferences" when "determining whether the pleaded facts give rise to a 'strong' inference of scienter."  *Id.* at 323.  This results in an "inherently comparative" inquiry in which the court asks: "How likely is it that one conclusion, as compared to others, follows from the underlying facts?"  *Id.*  The complaint will withstand a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.  This inquiry calls for consideration of the complaint and other sources normally examined in a Rule 12(b)(6) proceeding in their "entirety," for the inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 322-23.  In short, the court must make "a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter."  *Slayton v. American Exp. Co.*, 604 F.3d 758, 775 (2d Cir. 2010) (internal quotation marks omitted).

The United States Court of Appeals for the Second Circuit has explained that a complaint may establish a strong inference of scienter by "alleging facts to show either (1) that defendants

had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Joint Pension Trust of Chic. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). Plaintiffs attempt to plead scienter under both prongs. The Court first considers plaintiffs allegations under each prong and concludes that they are, under Second Circuit precedent, insufficient to establish a strong inference of scienter. The Court then proceeds to the *Tellabs* analysis and, viewing the whole factual picture painted by the Complaint, finds that the more cogent and compelling inference is that defendants lacked fraudulent intent.

> 1. *Plaintiffs fail to allege facts to show that defendants had the motive and the opportunity to commit fraud*

Motive "entail[s] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Novak*, 216 F.3d at 307 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)). The benefits of the fraud must accrue to the defendants in "some concrete and personal way." *Novak*, 216 F.3d at 307. Accordingly, "[m]otives that are common to most corporate officers . . . do not constitute 'motive' for purposes of this inquiry." *ECA & Local 134*, 553 F.3d at 198. The set of universal, and hence insufficient, motives include "the desire to keep stock prices high to increase officer compensation," *id.*, "a company's desire to maintain a high bond or credit rating," *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996), and "[t]he motive to maintain the appearance of corporate profitability, or of the success of an investment," *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996). These motives, which can be "imputed to any publicly-owned, for-profit endeavor, [are] not sufficiently concrete for the purposes of inferring scienter." *Id.*

The Complaint attributes four motives to the Individual Defendants that the Court

considers in turn.  None are sufficient to support a strong inference of scienter under the Second Circuit's caselaw.

a.  Insider stock sales

The Complaint asserts that the Individual Defendants defrauded investors in order to "profit[] substantially by selling their personal shares of Crystallex stock."  (Compl. ¶ 146). "[A]dequate motive ar[i]se[s] from the desire to profit from extensive insider sales."  *Novak*, 216 F.3d at 308.  The sales alleged here are not extensive enough to support a strong inference of scienter.

The Complaint does not allege that defendants Bruce, Thompson or Fung sold any Crystallex shares during the Class Period.  Plaintiffs hang their hat on a single stock sale by a single defendant: Oppenheimer, who at all relevant times was an outside director of the company (Compl. ¶ 24), allegedly sold Crystallex shares on April 21, 2008 for gross proceeds of about $550,000 (*id.* ¶ 70).  Courts routinely hold, however, that insider sales by a single defendant are insufficient to give rise to a strong inference of scienter where, as here, the remaining individual defendants did not sell any shares.  *See, e.g.*, *San Leandro*, 75 F.3d at 814; *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).

Context matters in this inquiry, *see San Leandro*, 75 F.3d at 814; *Acito*, 47 F.3d at 54, and plaintiffs contend that Oppenheimer's sale is particularly suspicious because it occurred after MARN's denial of the Final Permit on April 14 but before Crystallex's disclosure of the denial on April 30.  (*Id.* ¶ 147.)  While the Complaint does not allege facts specifying when Crystallex or Oppenheimer became of aware of MARN's denial, the timing of this sale is potentially suspect.  However, in the context of this case, the Court finds that the timing of this single stock sale by a single outside director defendant does not give rise to a strong inference that defendants

were engaged in a fraud.  In this regard, *Acito v. IMCERA Group* is instructive.  There, an adverse plant inspection forced the defendant manufacturer to suspend production.  The company did not notify investors of this development until one month later.  *Acito*, 47 F.3d at 51.  In between the adverse inspection and the company's announcement of it, a single outside director of the defendant corporation sold approximately 11% of his holdings in shares and options of the company's stock.  The plaintiffs in *Acito* argued that this single trade evinced the defendants' motive to delay notifying the public of the adverse news in order to sell stock at a huge profit.  *Id.* at 54.  The Second Circuit rejected this argument, noting that the fact that the absence of allegations that any of the other defendants sold any shares during that time period undermined the plaintiffs' theory of scienter.  *Id.*

The allegations in this action are similar to those in *Acito*.  Out of multiple defendants, only a single outside director is alleged to have sold a portion of his holdings in company stock and options between MARN's denial of the Final Permit and Crystallex's disclosure of that fact.  *Acito* counsels against finding that Oppenheimer's single sale supports a strong inference of scienter.

Further problematic for plaintiffs' theory is the absence of any allegations that Oppenheimer participated in the fraud.  *See San Leandro*, 75 F.3d at 814 n.14 (that the defendant did not have the opportunity to orchestrate the fraud undermined the plaintiffs' argument that the defendant's stock sales were indicative of scienter).  The Complaint does not attribute a single alleged misstatement to Oppenheimer.  Nor does it plead facts suggesting that Oppenheimer, an outside director throughout the Class Period, exerted any control over Crystallex's public statements.  *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*, 446 F. Supp. 2d 163, 180 (S.D.N.Y. 2006) (outside directors are generally not presumed to

be responsible for a corporation's statements); *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 494 (S.D.N.Y. 2005) (same).

The defendants to whom misstatements are actually attributed are not alleged to have sold any Crystallex stock during the Class Period.  That these defendants – all well-placed to take advantage of the fraud they allegedly committed – did not engage in any stock sales during the class period fatally undermines the motive allegations premised on Oppenheimer's lone sale.[2] *See In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 289 (S.D.N.Y. 2006); *In re Glenayre Techs., Inc. Sec. Litig.*, No. 96 Civ. 8252, 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998).

Other stock sales referenced in the Complaint do not warrant a contrary conclusion. Plaintiffs allege that Oppenheimer sold shares on April 10, 2006 for gross proceeds of approximately $1.7 million and that other Crystallex directors and officers not named as defendants sold shares during the Class Period.  (Compl. ¶ 70.)  These sales do not support plaintiffs' theory of motive for a number of reasons.  First, as to the sales by officers and directors not named as defendants, the Complaint gives no indication as to why the Individual Defendants would have been motivated to defraud investors in order to enrich others, not themselves.  *See Geiger v. Solomon-Page Grp., Ltd.*, 933 F. Supp. 1180, 1190 (S.D.N.Y. 1996) (finding no strong inference of fraudulent intent where the complaint did not plead facts that the defendants were somehow motivated to commit fraud out of a concern for the financial well-being of others).  Second, plaintiffs do not allege any facts that would indicate that these sales were unusual.  *See, e.g., In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561

---

[2]  The Complaint does not allege what percentage of Oppenheimer's holdings his April 2008 sale reflected. Defendants represent that the sale reflected 13% of Oppenheimer's total ownership of common stock and unexercised options.  (Defs.' Mem. in Supp. of Mot. to Dismiss at 26.)  Plaintiffs concede the point, but argue that the more relevant fact is that Oppenheimer's sale liquidated 38% of his shares in Crystallex's common stock, exclusive of his unexercised options.  (Pls.' Mem. in Opp. to Mot. to Dismiss at 6, 12 n.6.)  This dispute is immaterial.  Even taking plaintiffs' preferred percentage, the Court concludes that Oppenheimer's sale does not give rise to a strong inference of scienter in light of the absence of any sales by the supposed perpetrators of the alleged fraud.

16

(S.D.N.Y. 2004) ("While 'unusual' executive stock trading under some circumstances may give rise to an inference of fraudulent intent, executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent." (citation omitted)).  Finally, the timing of these sales decouples them from the alleged fraud.  With the exception of one $18,000 transaction, all of the alleged sales occurred either before the Class Period or during the first month of the Class Period.  (Compl. ¶ 70.)  Given that all but two of the alleged misrepresentations occurred after these sales occurred, "the theory of insider selling as a motive for misrepresentations is effectively negated." *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 469 (S.D.N.Y. 2008).

> b.   Executive compensation and position

The remaining motive allegations are all too general to support a strong inference of scienter.  Plaintiffs allege that the Individual Defendants were motivated to commit fraud in order to "protect and enhance [their] executive positions and the substantial compensation and prestige obtained thereby."  (Compl. ¶ 140.)  The Second Circuit has repeatedly made clear, however, that "the desire to maintain a high stock price in order to increase executive compensation, or prolong the benefits of holding corporate office" is not a cognizable motive. *Novak*, 216 F.3d at 307 (citation omitted).

Plaintiffs contend that Robert A. Fung had a more particular motive to inflate the value of Crystallex stock because he was deeply in debt during the Class Period.  (Compl. ¶ 143.)  The factual allegations do not support this theory.  Fung is not alleged to have sold any Crystallex stock over the course of the alleged fraud.  Plaintiffs also allege that Fung was affiliated with other companies that Crystallex utilized for underwriting, consulting and investment banking services.  (*Id.* ¶ 142.)  But the Complaint fails to plead facts that could support an inference that Fung was motivated to commit fraud in order to profit from these affiliations.  It does not plead

how Fung stood to profit from Crystallex's transactions with these entities, if at all, or even whether Crystallex contracted or paid for most of these services during the Class Period.

c.   Delaying debt repurchase obligation

According to the Complaint, in December 2004 Crystallex completed a $100 million debt issuance. (*Id.* ¶ 44.)  The notes issued allegedly contained a covenant whereby Crystallex agreed to purchase them back at 102% of the principal amount in the event Venezuela denied the company's request for the Final Permit. (*Id.* ¶¶ 135-36.)  Plaintiffs allege that defendants' "desire to avoid and/or delay the triggering of a massive Note repurchase obligation" – an obligation that would have "financially crippled" the company – "gave them a strong motive to tout the receipt of the Final Permit for Las Cristinas as imminent." (*Id.* ¶ 139.)

This alleged motive is not the kind of particularized motive that the Second Circuit's precedent recognizes.  The theory that defendants engaged in fraud "to protect the very survival of the company" is "far too generalized (and generalizable) to allege the proper concrete and personal benefit required by the Second Circuit." *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009) (internal quotation marks omitted); *see, e.g.*, *Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405, 2009 WL 174656, at *16 (S.D.N.Y. Jan. 26, 2009) (defendant's "motive to maintain a financial rating to protect the viability of the Company is not sufficient, under the law of this Circuit, to establish a motive to commit fraud").

To the extent delaying the repurchase obligation were a viable motive, it is not clear how defendants' alleged fraud could succeed.  "When evaluating motive and opportunity allegations, the Second Circuit authorizes inquiry, even at the motion to dismiss stage, as to whether plaintiffs allege a scheme that has any chance of achieving its putative ends." *In re GeoPharma, Inc., Sec. Litig.*, 411 F. Supp. 2d 434, 443 (S.D.N.Y. 2005).  If defendants sought to prevent or

18

postpone the triggering of the repurchase obligation – that is to prevent or postpone MARN's denial of the Final Permit – it is not at all evident how statements giving investors the supposedly false impression that Crystallex was likely to obtain the Final Permit could serve this end.  There are no allegations in the Complaint that support the inference that these statements delayed MARN's ultimate decision.  And there is no reason to suppose that they could have had this effect.  Nor are there allegations that defendants' statements somehow prompted the note holders to refrain from enforcing the repurchase obligation.  To be sure, the Complaint contends that defendants' misstatements "successfully delayed the repurchase of the Notes for several years," (Compl. ¶ 139), but this is a totally conclusory allegation, lacking factual support to buttress it, and it is therefore "not entitled to be assumed true," *Iqbal*, 129 S. Ct. at 1951.  The failure to allege the "prospect of achieving concrete benefits by the means alleged," *Novak*, 216 F.3d at 307, undermines plaintiffs' theory that defendants committed fraud in order to avoid the debt repurchase obligation.

### d.   Stock offerings

Plaintiffs' fourth and final alleged motive is this: "Defendants' Class Period false statements were part of a scheme to artificially inflate the price of Crystallex stock so that the Company could sell such stock to raise cash."  (Compl. ¶ 132.)  Crystallex engaged in multiple stock offerings during the Class Period that raised hundreds of millions of dollars for the company.  (*Id.* ¶ 133.)  Plaintiffs allege that "[w]ere it not for Defendants' false statements and the resulting inflated stock price, Defendants would not have been able to raise as much cash as they did."  (*Id.* ¶ 132.)

This purported motive comfortably fits within the set of universal corporate motivations that are inadequate to sustain a securities fraud complaint.  A company issuing stock "always has

a generalized motive to ensure the success of the issue and to raise as much money as possible." *Geiger*, 933 F. Supp. at 1189; *see In re Emex Corp. Sec. Litig.*, No. 01 Civ. 4886, 2002 WL 31093612, at *6 (S.D.N.Y. Sept. 18, 2002) ("[A] desire to raise much needed capital is an insufficient generalized motive to support an inference of scienter." (internal quotation marks omitted)); *Feasby v. Industri-Matematik Int'l Corp.*, No. 99 Civ. 8761, 2000 WL 977673, at *4 n.5 (S.D.N.Y. July 5, 2000) ("[A]llegations that defendants were motivated by a desire to raise capital or benefitted by raising capital are insufficient." (internal quotation marks omitted)). While in limited circumstances the desire to enhance a stock price in advance of an offering can give rise to an inference of fraudulent intent, *see Rothman v. Gregor,* 220 F.3d 81, 93 (2d Cir. 2000) ("in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter"), such circumstances are not present here.  The bald allegation that defendants committed fraud out of a desire to raise capital for the corporation does not give rise to a strong inference of fraudulent intent.

> 2.  *Plaintiffs fail to allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness*

Having failed to plead motive and opportunity, plaintiffs also seek to plead scienter "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Novak*, 216 F.3d at 307 (quoting *Acito*, 47 F.3d at 52).  Recklessness in the securities fraud context is "not merely a heightened form of negligence," but a "state of mind approximating actual intent."  *S. Cherry St., LLC v. Hennessee Grp., LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis omitted) (quoting *Novak*, 216 F.3d at 312).  It entails "conduct that at the least . . . is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *S. Cherry*, 573 F.3d at 109 (emphasis and internal

quotation marks omitted).  Where a plaintiff "has failed to demonstrate that defendants have a motive to defraud . . . he must produce a stronger inference of recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001).

Plaintiffs state most succinctly in their legal memorandum what in fact is a gravamen of their Complaint; specifically, plaintiffs argue that defendants acted recklessly in that they "knew or should have known that by March 2006 the Permit was not forthcoming, but nevertheless continued touting its imminent receipt."  (Pls.' Mem. in Opp. to Mot. to Dismiss ("Pls.' Mem.") at 24.)  To support a strong inference of recklessness, plaintiffs offer the following allegations that they urge put defendants on notice that they would not receive the Final Permit: 1) the additional submissions Crystallex made to MARN during the Class Period; 2) Sergio Rodriguez's statements that MARN had environmental "concerns" with Crystallex's permit application; 3) the presence on Crystallex's board of Tejara-Paris, allegedly a political opponent of the governing regime of Hugo Chavez, on Crystallex's board; and 4) the delay in the permitting process.

In evaluating these allegations, the Court is guided by the principle that "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  *Novak*, 216 F.3d at 316.  Thus, "Second Circuit cases uniformly rely on allegations that specific contradictory information was available to defendants at the same time they made their misleading statements." *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006).

The Court is also mindful that corporate officials do not act recklessly simply by making optimistic projections that ultimately fail to materialize.  "[M]isguided optimism is not a cause of action, and does not support an inference of fraud." *Shields*, 25 F.3d at 1129.  "[A]s long as the

public statements are consistent with reasonably available data, corporate officials need not

present an overly gloomy or cautious picture of current performance and future prospects."

*Novak*, 216 F.3d at 309; *see Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999)

("Management's optimism that is shown only after the fact to have been unwarranted does not,

by itself, give rise to an inference of fraud.").

Measured against these standards, plaintiffs' allegations do not constitute strong

circumstantial evidence of recklessness because they do not particularize how and why

defendants knew, or were reckless in not knowing, that their statements about the Final Permit

application were false.[3]  While alert to the need to consider plaintiffs factual allegations

"collectively," *Tellabs*, 551 U.S. at 323, the Court, "for the sake of clarity and ease of analysis,"

"will first examine [plaintiffs'] factual allegations individually, before undertaking the required

holistic assessment," *In re PXRE Grp.*, 600 F. Supp. 2d at 537.

a.   Further submissions to MARN

At the start of the Class Period, Crystallex issued a press release announcing that the

mining ministry's approval of the company's Feasibility Study represented the "final external

input required by [MARN] to complete the permitting process."  (Compl. ¶ 65.)  According to

the Complaint, Crystallex made multiple additional submissions to MARN after this statement

---

[3]      The Court notes that in a case such as this one, which concerns statements expressing optimism about the success of a permit application, the scienter inquiry tends to merge with the falsity inquiry.  *Cf. In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 502-03 (S.D.N.Y. 2004) ("[I]f the plaintiffs alleged that the defendants issued overly optimistic sales forecasts, it would be impossible to show that the forecasts were false when made unless the plaintiffs could plead facts indicating that the speakers had access to information that contradicted those forecasts," i.e. that they acted with scienter.)
       The Court also notes that well-pled allegations of recklessness would not necessarily withstand the motion to dismiss in this case.  Defendants contend that the statements at issue here fall within the PLSRA's safe harbor provision for forward-looking statements.  *See* 15 U.S.C. § 78u-5.  To state a claim of securities fraud premised on statements to which the safe harbor applies, plaintiffs would need to allege more than recklessness – they would need to plead that defendants made the statements with actual knowledge of their falsity.  *Id.* § 78u-5(c)(1)(B); *Slayton*, 604 F.3d at 776 n.9.  As a result of the Court's conclusion that plaintiffs have failed to meet the lower standard of recklessness, the Court need not, and does not, address whether the safe harbor's stricter scienter requirement applies.  The failure to plead recklessness necessarily implies the failure to plead actual knowledge.  *See id.*; *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 n.18 (9th Cir. 2002).

was made.  Plaintiffs allege that "the quality and quantity of those additional 'external inputs' demonstrate that Defendants were, and should have known that they were, far from obtaining the Final Permit."  (*Id.* ¶ 67.)

To the extent that plaintiffs rely on these allegations to demonstrate scienter for statements made on March 26, March 31 and May 11, 2006 indicating that MARN had received the "last" or "final" "external inputs required" for consideration of the permit application, (*id.* ¶¶ 65, 68, 71), such reliance is unavailing.  The March 2006 statements are not rendered fraudulent merely because Crystallex made additional submissions to MARN in May 2006, November 2006 and the first quarter of 2007.  "[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."  *Novak*, 216 F.3d at 309.  "[P]laintiffs may not plead fraud by hindsight."  *Slayton*, 604 F.3d at 776.  The same conclusion holds true for the May 11, 2006 statement, since, with one immaterial exception, the additional submissions to MARN identified in the Complaint were made subsequent to the May 11 statement.[4]

Nor can plaintiffs rely on the additional external inputs to establish scienter for the remaining statements.  Their theory – that "the *quality and quantity* of th[e] additional 'external inputs' demonstrate[d] that Defendants were, and should have known that they were, far from obtaining the Final Permit," (Compl. ¶ 67 (emphasis added)) – is not adequately pled.  The Complaint describes the additional submissions to MARN in threadbare terms:

- In a May 11, 2006 press release the Company indicated that it had submitted "additional data and studies to the MARN" beyond the Environmental Impact Study it submitted in April 2004.  (*Id.* ¶¶ 41, 72.)
- Crystallex and a company that was developing another mining project were

---

[4]     The exception is the submission of the "additional data and studies to the MARN" Crystallex disclosed in *the very same press release* containing the alleged May 11 misstatement.  (Compl. ¶ 72.)  The Court sees no basis to infer scienter, or falsity for that matter, where a purportedly misleading statement is accompanied by the facts it supposedly omits.

required to enter into agreements to share certain resources, like an air strip, in order to reduce the overall environmental impact of the projects. (*Id.* ¶ 81.) A November 14, 2006 release explained that Crystallex "had completed these agreements for 'six joint regional projects' and had submitted them to MARN and other Venezuelan government authorities." (*Id.*)

- Finally, in announcing its results for the first quarter of 2007, Crystallex disclosed that in recent months it had continued "to respond to questions raised by MARN on technical and environmental issues related to Las Cristinas" and that MARN officials had made an "on-site inspection of the property during the week of April 23, 2007." (*Id.* ¶ 87.)

These allegations reveal nothing about the quality and quantity of the additional submissions in the overall context of the permit application. And with the exception of the questions MARN put to Crystallex, the Complaint does not even allege that it was MARN that requested these additional inputs rather than Crystallex supplying them on its own initiative to substantiate further its application. As a result, they do not easily lend themselves to the inference that the additional submissions were of a "quality and quantity" sufficient to demonstrate that defendants were reckless in believing they would receive the Final Permit.

Even if the Court were to draw an inference that the additional submissions were of a significant quantity and quality, plaintiffs' theory would still be wanting. Knowledge of the need to supplement a permit application is not equivalent to knowledge that the permit application is unlikely to succeed. It is not per se reckless for defendants to remain confident about the outcome of the permitting process in the face of the need to supplement their permit application. Defendants could have reasonably believed that their additional submissions were adequate to secure permit approval. Indeed, there is strong reason to infer that that is exactly what defendants thought, for after receiving the additional submissions, MARN in June 2007 approved Crystallex's Environmental Impact Study. (*Id.* ¶ 101). The Complaint offers no allegations from which the Court could infer that defendants did not believe that their additional submissions to MARN would satisfy that agency.

24

       b.  Rodriguez's statements regarding MARN's environmental "concerns"

Plaintiffs argue that the Complaint adequately pleads recklessness by citing the concerns raised by MARN official Sergio Rodriguez, which supposedly put defendants on notice that their permit application raised "serious environmental objections." (*Id.* ¶ 100.)  According to the Complaint, defendants "ignore[d]" these concerns.  (*Id.*)  Plaintiffs contend that because defendants ignored these red flags, defendants necessarily were reckless in touting the likely success of the Final Permit application.  This theory of scienter is based more on conclusory assertions than factual allegations.  Indeed, the factual allegations in the Complaint do not lend themselves to the inferences that plaintiffs draw.

Plaintiffs first rely on a March 2007 Reuters article in which Rodriguez criticized Crystallex for not "act[ing] responsibly in drawing up the project so as to minimize environmental objections," and failing to develop an adequate plan to manage copper and cyanide at Las Cristinas.  (*Id.* ¶ 96.)  In support of their view that defendants ignored Rodriguez's concerns, plaintiffs rely on the supposedly "false exculpatory statement" Crystallex issued in response to the Reuters article. (*Id.* ¶ 97.)  The press release indicated that Crystallex contacted senior officials at MARN who told the company "that the Reuters story does not reflect the statements made by Mr. Rodriguez and that they are contacting Reuters in order to correct the mis-statements." (*Id.*)  Plaintiffs contend this was false because no MARN officials apparently ever contacted the news agency to correct the story.  (*Id.* ¶ 96.)  Thus, plaintiffs urge, the "false" press release shows that defendants acted with scienter.

The events of March 2007 are not as probative of scienter as plaintiffs contend.  To begin with, the fact that in a follow-up Rodriguez sought to quell the "uproar" resulting from the "misunderstanding" of his comments by clarifying that Crystallex did not have to "draw up a

new project" (*id.*) suggests that Crystallex's press release was not false.  More to the point, the

facts alleged do not indicate that Crystallex disregarded Rodriguez's or MARN's concerns.  The

Complaint never refers to concerns regarding copper or cyanide again; tellingly, they are not

listed among the reasons for the denial of the Final Permit.  (*Id.* ¶ 115.)  And in the same time

frame as Rodriguez's comments, Crystallex was continuing "to respond to questions raised by

MARN on technical and environmental issues related to Las Cristinas."  (*Id.* ¶ 87.)   One month

later, April 2007, the company had MARN officials on-site for an inspection.  (*Id.*)  Finally, in

June 2007, MARN approved Crystallex's EIS.  (*Id.* ¶ 101.)  These allegations are inconsistent

with plaintiffs' assertion that defendants ignored Rodriguez's March 2007 concerns.

   Plaintiffs maintain that Crystallex went on to ignore the concerns Rodriguez aired at an

October 2007 hearing before a committee of the Venezuelan National Assembly.  But the facts

alleged do not indicate that the results of that hearing should have given Crystallex pause about

the status of the Final Permit.  The minutes of the meeting, relied upon and specifically quoted in

the Complaint, (*id.* ¶ 105), attribute to Rodriguez the following remarks: Rodriguez "referred, in

general, to environmental aspects.  He also agreed with the matters related to the participation of

Community Councils in the projects to be developed."  (Exh. C. to Decl. of Scott D. Musoff in

Supp. of Mot. to Dismiss dated Aug. 14, 2009 ("Musoff Decl."), at 4.)  The minutes further

noted that:

> In a second exchange of ideas, the participants in the meeting agreed to study a
> proposal based on the endogenous development of the region [endógeno de la
> region], with an integral view that includes the people's participation, taking the
> Community Councils as a basis.  This proposal should provide for sustainable
> development and have a marked participation.

(Compl. ¶ 105.)  In light of the meeting minutes, the Complaint declares that "the requirements

for the Final Permit were still not met."  (*Id.* ¶ 105.)  But the Complaint does not explain why

this is so, and the Court sees no obvious connection between Rodriguez's comments or the "endogenous development" proposal and the Final Permit application.  In fact, multiple participants in the meeting – all of whom agreed to study the endogenous development proposal – stated their belief that the conditions for issuing the permit had been met.  (Exh. C to Musoff Decl., at 3-4.)  Thus, plaintiffs' conclusory assertion that this proposal somehow demonstrated that the requirements for the Permit had not been met is not borne out by the very record of the meeting utilized by plaintiffs in the Complaint.

Plaintiffs point out that the meeting minutes do not indicate that Rodriguez, the only representative from MARN at the meeting, was among those expressing a belief that the requirements for the permit had been met.  But according to the minutes, the chairman of the National Assembly committee "informed of the conversations held with the highest authorities of the Ministry of the Environment, from which conversations it was concluded that there is no legal impediment for the MARN[] to grant the permits."  (*Id.* at 3.)  Furthermore, one of the official conclusions of the meeting was that Crystallex had complied with the requirements for the permit from MARN.  (*Id.* at 4-5.)  Given these positive assessments and the absence of any clear link between the endogenous development proposal and the permit requirements, the Court finds no reason to infer that the discussions at the National Assembly committee meeting should have led defendants to know that their positive assessments of their chances for securing the Permit were false or reckless.

c.   The presence of Enrique Tejara-Paris on Crystallex's board

Equally uncompelling is plaintiffs' contention that Crystallex's involvement with a supposed opponent of the Chavez government demonstrated that defendants knew for "several years that the final permit for Las Cristinas would likely not be granted."  (Compl. ¶ 129.)

According to the Complaint, Enrique Tejara-Paris, a member of the boards of Crystallex and its Venezuelan subsidiary, had been involved in a 2002 failed coup against Hugo Chavez.  (*Id.* ¶¶ 126, 127.)  In 2008, a former Crystallex employee in Venezuela apparently told the website VHeadline.com that "it was already made known to Crystallex several years ago that ETP's [Dr. Tejara-Paris's] then chairmanship of the Venezuelan subsidiary made it impossible for the CVG/Crystallex deal to go through and that ETP's subsequent resignation from the board was not seen as sufficient to 'cleanse' Crystallex' repute[t]ion as a serious player in the Venezuelan mining sector."  (*Id.* ¶ 127 (bracketed material in original).)

The Complaint does not specify who had it "made known" that Crystallex's affiliation with Tejara-Paris was an obstacle, to whom this was made known, what precisely was made known, how it was made known or when it was made known.  A conclusory allegation that contrary information was well known within a company – and that is all that plaintiffs offer here – does not create a strong inference of scienter.  *Cf. In re Citigroup Inc. Sec. Litig.*, No. 07 Civ. 9901, 2010 WL 4484650, at *33 (S.D.N.Y. Nov. 9, 2010) ("Plaintiffs cannot rely on assertions that the information presented by confidential witnesses was known or common knowledge within the company; these assertions are too vague and conclusory to support a finding that defendants knew they were making false statements or made those statements with reckless disregard for their truth or falsity.").

d.  Delay in the permitting process

In June 2007, MARN issued a formal notice to CVG that the requirements for the issuance of the permit "have been fulfilled."  (Compl. ¶ 101.)  As a prerequisite to issuance of the permit, MARN requested the posting of a bond and the payment of taxes.  (*Id.*)  Crystallex complied with these requests.  (*Id.*)  CVG confirmed for Crystallex that "the posting of the bond

and the payment of the taxes represent the final and conclusive step in the procedure for the issuance of the Environmental permit." (*Id.*) In a series of statements over the ensuing ten months, Crystallex repeated what it had been told and stated its expectation that it would receive the Final Permit. (*Id.* ¶¶ 102, 104, 106, 108, 110, 112.) The Complaint alleges that the delay in the receipt of the permit even after Crystallex "had supposedly been told [by CVG] it was in the 'final steps in the process for the issuance of the [Final] Permit'" "was a red flag to Crystallex management" that MARN's environmental concerns had not been resolved. (*Id.* ¶ 103.)

The Court finds this allegation unavailing. The delay does not indicate that Crystallex had not complied with requirements for the issuance of the permit, as it had previously been informed. Nor could the delay itself communicate to defendants that, despite MARN's approval of Crystallex's EIS, environmental concerns remained. To be sure, the delay might have provided a reason to be skeptical about the eventual issuance of the Final Permit. But any such skepticism would have been based on speculation, rather than concrete indications about an infirmity in Crystallex's application. The fact remained that Crystallex had been told in June 2007 by CVG, Venezuela's state-owned mining enterprise, that it had satisfied MARN's requirements, and there are no allegations in the Complaint that defendants were subsequently told otherwise. The delay alone does not give rise to a strong inference defendants acted recklessly in failing to abandon their optimism that what they had been told was accurate.

The Complaint lacks allegations that MARN, prior to the denial of the Final Permit, informed Crystallex – or anyone else, for that matter – that it would not issue a permit to the company. Plaintiffs' allegations of recklessness, considered in their entirety, at most establish that defendants should have been more skeptical about the receipt of the permit. But a deficit of skepticism does not indicate the presence of scienter. *See Shields*, 25 F.3d at 1129 ("The

pleading strongly suggests that the defendants should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud.").  Accordingly, the Complaint does not set forth facts sufficient to establish a strong inference of scienter under the Second Circuit's caselaw.

### 3.   *Competing inference of nonfraudulent intent*

The facts alleged in the Complaint support a compelling inference that defendants did not act recklessly in making optimistic pronouncements concerning the status of Crystallex's Final Permit application.  Viewing the overall factual picture alleged in the Complaint, the Court concludes that plaintiffs' proffered inferences of fraudulent intent are neither as cogent nor as compelling as is an inference of nonfraudulent intent.

Facts alleged in the Complaint support the inference that Crystallex was making steady, if slow, progress toward its goal of obtaining the Final Permit – progress that warranted management's optimism.  In March 2006, the mining ministry approved Crystallex's feasibility study, a prerequisite to approval of the Final Permit.  (Compl. ¶ 65.)  Throughout the Class Period, Crystallex earned the support of various political figures in Venezuela who urged MARN to grant the permit.  (*Id.* ¶¶ 75, 105.)  Most importantly, in June 2007, MARN itself approved Crystallex's environmental impact study.  (*Id.* ¶ 101.)  CVG, the state-owned mining company, notified Crystallex that MARN was now requesting the posting of a bond and the payment of certain taxes.  MARN apparently told CVG that "the Environmental permit will be issued following the payment of taxes and posting of the bond."  (*Id.*)  To be sure, this factual matter is found in the Complaint's quotations from Crystallex's press releases.  But plaintiffs do not allege that any of these developments that Crystallex announced were false or inaccurate.

Furthermore, Crystallex made known publicly many of the hiccoughs in the permit

application process that are seized upon in the Complaint.  This candidness undermines an inference of fraudulent intent.  *See Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) (allegations that defendants behaved recklessly were weakened by their voluntary disclosure of certain financial problems prior to the deadline to file financial statements); *In re Nokia Corp. Secs. Litig.,* No. 96 Civ. 3752, 1998 WL 150963, at *13 (S.D.N.Y. Apr.1, 1998) ("If anything, the fact that [defendant] voluntarily chose to issue a press release earlier than its standard year-end reporting . . . undercuts the allegation that defendants were acting recklessly.").  That Crystallex was making submissions to MARN throughout the Class Period was not a secret – all of plaintiffs' allegations on this point come directly from Crystallex press releases that were contemporaneous with the additional submissions.  Crystallex also repeatedly informed investors about the delays in the permitting process and their adverse impact on the company.  (Crystallex press release dated Mar. 31, 2006 (quoted in Compl. ¶ 68), Ex. I to Musoff Decl.; Crystallex press release dated Mar. 29, 2007 (quoted in Compl. ¶ 94), Ex. J to Musoff Decl.)  Crystallex repeated these warnings even after it had been informed by CVG that it had complied with the requirements for the issuance of the Final Permit, telling investors that "the continued delay in receipt of the Permit could have a material adverse affect on the future of the Corporation's business" and that "[t]here can be no assurance as to when or if the Permit will be granted." (Crystallex press release dated Aug. 10, 2007 (quoted in Compl. ¶ 102), Ex. K to Musoff Decl.; Crystallex press release dated Nov. 14, 2007 (quoted in Compl. ¶ 108) Ex. L to Musoff Decl.)

In sum, the Court concludes that plaintiffs inferences of scienter are not "as compelling" as an opposing inference of nonfraudulent intent.  *Tellabs*, 551 U.S. at 324.  Plaintiffs' section 10(b) claims premised on defendants' statements regarding the Final Permit are therefore

dismissed.[5]

     D.   <u>Plaintiffs Fail to Plead Falsity or Scienter for Statements Concerning
Nationalization of Mining in Venezuela</u>

In addition to statements concerning the Final Permit, the Complaint takes issue with

certain of defendants' remarks concerning changes to Venezuela's mining laws providing for

partial nationalization of the mining industry.  According to the Complaint, the new law

"require[d] mining companies to create a joint venture with the Venezuelan government, in

which the government would own a majority stake in the newly-created 'mixed company.'"

(Compl. ¶ 73.)  It is not clear whether plaintiffs seek to pursue claims on the basis of these

statements.  (See Pls.' Mem. at 15 ("The Complaint challenges two types of statements:

(i) statements concerning the completeness of the Company's Permit application; and,

(ii) statements concerning the imminence of, or the lack of any impediment to, the receipt of the

Permit.").)  In any event, the Complaint fails to state a claim with respect to these statements.

First, the Complaint does not explain why defendants' statements concerning the

Venezuela's mining law were false, as both Rule 9(b) and the PLSRA require.  For example,

Bruce, at the time Crystallex's CEO, explained that the changes in Venezuela's law were aimed

---

[5]     Ten days ago plaintiffs submitted to the Court a Crystallex press release announcing that CVG canceled the company's operating contract for Las Cristinas on February 3, 2011 because of "lack of activity for more than one year and . . . reasons of opportunity and convenience."  (Enclosure to Pls.' letter to Court dated Mar. 18, 2011 (internal quotation marks omitted).)  This development – coming nearly three full years after MARN's denial of the Final Permit – is irrelevant to plaintiffs' theory of scienter. *See Slayton*, 604 F.3d at 776 ("[P]laintiffs may not plead fraud by hindsight.").

     Finally, plaintiffs argue that the Supreme Court's decision last week in *Matrixx Initiatives, Inc. v. Siracusano*, No. 09-1156 (U.S. Mar. 22, 2011) supports finding that they have adequately alleged scienter.  (Pls.' letter to Court dated Mar. 24, 2011.)  In particular, they home in on the Supreme Court's observation that the misleading nature of a particular statement can support an inference of scienter.  *Matrixx*, slip op. at 21 n.15.  This is hardly a novel principle.  A statement can be so "dramatic[ally]" false as to warrant an inference of recklessness.  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)).  That was the case in *Matrixx*, where the defendant publicly suggested that studies had confirmed that its drug did not have a particular side effect, yet the defendant knew that no such studies existed and that its own panel of scientists could not confirm the safety of the drug.  *Matrixx*, slip op. at 21.  There is no such blatantly false representation here.  As set forth in detail above, the most compelling inference is that defendants' optimism about the receipt of the Final Permit was not reckless given the progress they made and the assurances they received throughout the application process.

at companies that owned mineral assets or concessions to mineral assets.  (*Id.* ¶ 77.)  That category did not include Crystallex, which had no ownership of or concession rights to Las Cristinas.  (*Id.* ¶ 35.)  The Complaint chastises Bruce for not "showing concern" for Venezuela's "changing attitude" towards foreign companies (*id.* ¶ 78), but does not explain what, if anything, was inaccurate about Bruce's characterization.  The failure to explain why this and other statements concerning Venezuela's laws were misleading necessitates dismissal of the Rule 10b-5 claims premised on these statements.

Second, the Complaint lacks any allegations that would supply a strong inference that defendants made the statements concerning Venezuela's mining law with scienter.  Plaintiffs' motive and opportunity allegations are, for the reasons set forth above, insufficient.  And plaintiffs offer no allegations of conscious misbehavior or recklessness in relation to these statements.

On account of these deficiencies, the claims relating to defendants' statements concerning Venezuela's mining laws are dismissed.

E.  Section 20(a) and Section 20A Claims

To establish control person liability pursuant to Section 20(a) or insider trading liability pursuant to Section 20A, plaintiffs must show a primary violation of the securities laws.  *See* 15 U.S.C. §§ 75t(a), 75t-1(a).  Accordingly, plaintiffs' failure to establish a violation of Section 10(b) and Rule 10b-5 necessitates dismissal of their Section 20(a) and 20A claims.  *See Slayton*, 604 F. 3d at 778 (Section 20(a)); *Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 704 (2d Cir. 1994) (Section 20A).

## III.   CONCLUSION

For the reasons set forth above, the Complaint is dismissed in its entirety and without prejudice.  If they believe they have reason to do so in good faith, plaintiffs may file a second amended complaint within twenty-one days of the entry of this order.

Dated: New York, New York
       March 28, 2011

SO ORDERED:

Sidney H. Stein, U.S.D.J.